# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MICHELLE A. DAHL,

          Plaintiff,

                                    Case No. 07-C-280

-vs-

IHOP MANAGEMENT HOSPITALITY
OF RACINE, INC.,

          Defendant.

## DECISION AND ORDER

Michelle Dahl ("Dahl") was fired from her position as General Manager of the International House of Pancakes in Racine, Wisconsin ("Racine IHOP"). Dahl brings claims under Title VII for gender discrimination, hostile work environment, and retaliation. The defendant, Management Hospitality of Racine, Inc. ("MHR"), moves for summary judgment. For the reasons that follow, this motion is granted.

## BACKGROUND

MHR is an Illinois corporation operating the Racine IHOP as a franchisee. MHR contracted with a restaurant management company, Flipmeastack, Inc. ("Flipmeastack"), to provide management services for the Racine IHOP. Flipmeastack provides management consulting to IHOP restaurants, including accounting services, corporate IHOP franchise reporting, human resources assistance, and management and employee training. In 2005, Steve Smith ("Smith") was employed by Flipmeastack as a District Manager. Mr. Smith's

assigned district consisted of five independently owned and operated IHOP restaurants located in Illinois and Wisconsin.

Ms. Dahl began her career with IHOP restaurants in 2001, when she was employed as an Assistant Manager at an IHOP restaurant located in Kenosha, Wisconsin. At the end of March 2002, Dahl was promoted to the position of General Manager at the Kenosha IHOP. In March 2005, Dahl became the general manager of the Racine IHOP.

Pursuant to its Sexual Harassment and Diversity Policy, the Racine IHOP has "zero tolerance" for sexual harassment. The Racine IHOP's Sexual Harassment and Diversity Policy states in part as follows:

> I have watched the Sexual Harassment and Diversity videos. I am fully aware of our company's policies regarding both zero tolerance for any type of unlawful discrimination and/or harassment. Our company is committed to providing a work environment that is free of unlawful behavior in any form. I will lead by example.
>
> \* \* \*
>
> We will take steps to foster these goals, including the implementation during training to heighten sensitivity to issues of diversity and towards the recruitment and training of a diverse workforce.
>
> \* \* \*
>
> Any form of unlawful harassment of co-workers or members of the public is absolutely forbidden, regardless of whether it is verbal, physical, or visual harassment.
>
> \* \* \*
>
> I will report any instances of improper behavior to my manager or company representative. The company will take immediate

>           and appropriate steps to investigate all reports of improper
>           behavior.

Flipmeastack provided training and assisted in the enforcement of the Racine IHOP's Sexual Harassment and Diversity Policy. Flipmeastack utilized a management training and policy hand-book provided by IHOP corporate, entitled "Eyes of an Operator," which provided specific training to general managers on how to follow the Sexual Harassment and Diversity Policy, and prevent sexual harassment, retaliation and discrimination in the workplace.

As the District Manager in 2005 for the Racine IHOP, Mr. Smith shared responsibility for enforcing the Racine IHOP's zero tolerance Sexual Harassment and Diversity Policy. Mr. Smith was responsible for ensuring that the policy was being followed by all Racine IHOP employees, and had responsibility for investigating complaints of sexual harassment and taking remedial action to stop sexual harassment.

Ms. Dahl was employed by MHR as the General Manager of the Racine IHOP from March of 2005 until her termination on May 25, 2005. As the General Manager, Ms. Dahl was responsible for implementing and enforcing the zero tolerance Sexual Harassment and Diversity Policy. When Ms. Dahl first became the General Manager of another Kenosha IHOP restaurant, which was also managed by Flipmeastack, she received six to eight weeks of management training in Bowling Brook, Illinois. The six-week management training course that Ms. Dahl attended included instruction regarding recipes, staffing issues, food certification, serve safe certification, red-cross certification and hands-on training.

Ms. Dahl was also required to complete an additional two weeks of management training entitled "Eyes of an Operator" in order to become a fully certified IHOP General

Manager. The "Eyes of an Operator" training that Ms. Dahl received pertained to human resources issues, and handling of staff policies and procedures. The "Eyes of an Operator" management training and policy book specifically addressed the investigation and prevention of sexual harassment, retaliation and discrimination.

Ms. Dahl was also required to view a training videotape, entitled "Sexual Harassment Manager's Guide" ("the sexual harassment video"), which specifically addressed identifying, reporting, and preventing sexual harassment in the workplace. Ms. Dahl was responsible for ensuring that the sexual harassment video was shown to all employees at the Racine IHOP. The sexual harassment video demonstrated what constituted sexual harassment by showing vignettes of actors performing acts of sexual harassment in the workplace. Ms. Dahl understood that the purpose of showing the sexual harassment video was to provide education and training to managers and employees alike with regard to identifying, reporting and preventing sexual harassment in the workplace.

The sexual harassment video instructed all employees, including Ms. Dahl, that allegations of sexual harassment were to be immediately reported to management. Ms. Dahl understood that she was ultimately responsible for ensuring that every new employee was provided with the Sexual Harassment and Diversity Policy. Ms. Dahl was also responsible for auditing all employee files to be sure that all employees signed the Sexual Harassment and Diversity Policy to ensure that every employee had viewed and understood the sexual harassment video. Ms. Dahl understood that there was zero tolerance of any sexual harassment at the Racine IHOP and that she was ultimately responsible for ensuring a

-4-

workplace free of discrimination and harassment. Ms. Dahl understood that as a General Manager all allegations of sexual harassment needed to be investigated. Ms. Dahl also understood that if she received a complaint of discrimination or harassment, she was responsible for asking the employee to provide a written statement. Ms. Dahl was aware that she was to follow the corporate chain of command and forward the complaint to her District Manager, Steve Smith, then to Steve Kuenstler, Director of Operations, and ultimately to Victoria Janmohammed, the President and Owner of Flipmeastack. Dahl perceived that she was not supposed to report harassment issues directly to Janmohammed, but she was provided with the cellular telephone numbers of all the managers employed by Flipmeastack, including that of Janmohammed.

Rosalio Gutierrez was employed as an Assistant Manager at the Kenosha IHOP during Ms. Dahl's tenure in Kenosha. Ms. Dahl terminated Mr. Gutierrez for engaging in poker games during working hours rather than supervising the employees under his direction. Prior to Ms. Dahl's arrival at the Racine IHOP, Mr. Smith rehired Mr. Gutierrez as an Assistant Manager for the Racine IHOP. Gutierrez resigned from this position on May 22, 2005. On May 23, Nadia Del Rio, one of Racine IHOP's Assistant Managers, informed District Manager Smith that some of the female servers were alleging that they had been sexually harassed by Gutierrez. Del Rio also informed Mr. Smith that Ms. Dahl may have been aware of the allegations of sexual harassment, but that Dahl had failed to act. May 23, 2005 was the first time that Mr. Smith had become aware of any allegations of sexual harassment at the Racine IHOP.

Upon being informed of the allegations of sexual harassment, Mr. Smith contacted his superiors, Steve Kuenstler and Victoria Janmohammed, to inform them about the allegations and discuss his investigation as well as potential corrective action. Janmohammed informed Smith that if he concluded that there was a violation of the Sexual Harassment policy, and that Ms. Dahl was aware of the allegations but had failed to follow the zero tolerance policy, Ms. Dahl would be terminated.

On May 23, 2005, Mr. Smith began his investigation into the allegations of sexual harassment against Mr. Gutierrez by conducting personal interviews with female servers. Several of the female servers informed Mr. Smith that Mr. Gutierrez was making sexually oriented comments to them about their bodies and about wanting to have sex with them. The servers also informed Mr. Smith that the sexual harassment had been happening for "some time," that they informed Ms. Dahl about their allegations, but that Ms. Dahl had done nothing about it.

On May 25, 2005 Mr. Smith continued his investigation at the Racine IHOP and interviewed additional servers about the allegations. These servers also indicated that Mr. Gutierrez was making sexually based comments to them.

On May 25, Ms. Dahl observed Mr. Smith conducting interviews with servers regarding the allegations of sexual harassment. While he was interviewing one server, Ms. Dahl approached Mr. Smith and asked him what was going on. Ms. Dahl asked Mr. Smith if there was something that she needed to know about. Mr. Smith informed Ms. Dahl that he was conducting a confidential investigation into allegations of sexual harassment and

asked her to step away from the table. Mr. Smith also explained that he was investigating whether or not Ms. Dahl did anything to report and investigate the allegations. In response, Ms. Dahl became upset and visibly angry. Ms. Dahl denied that she had any knowledge of allegations of sexual harassment by servers. In response, Mr. Smith informed Ms. Dahl that he didn't believe her.

Based upon his investigation, Mr. Smith would have terminated Mr. Gutierrez for violating the Racine IHOP's Sexual Harassment and Diversity Policy. However, Mr. Gutierrez had already left his employment at the Racine IHOP. The individuals that Mr. Smith interviewed stated that the conduct complained of had stopped when Mr. Gutierrez left his job. Accordingly, the allegations of sexual harassment were resolved.

After finishing his verbal interviews on May 23, 2005 and May 25, 2005, Mr. Smith concluded that the conduct complained of by the servers constituted a violation of the Racine IHOP's zero tolerance Sexual Harassment and Diversity Policy. Mr. Smith also concluded that Ms. Dahl had failed to follow the Racine IHOP's zero tolerance Sexual Harassment and Diversity Policy by failing to report the allegations of sexual harassment to him. Mr. Smith terminated Ms. Dahl due to her failure to report the allegations of sexual harassment at the Racine IHOP. Mr. Smith informed Ms. Dahl that because she failed to follow and enforce the Racine IHOP's Sexual Harassment and Diversity Policy, she would be terminated immediately. The Racine IHOP terminated Ms. Dahl's employment on May 25, 2005.

In response to being informed of her termination, Ms. Dahl became very angry, raised her voice and accused Mr. Smith of "harassing her." Ms. Dahl alleges that Mr. Smith

became upset and began badgering and intimidating her. Ms. Dahl alleges that Mr. Smith called her a f-ing compulsive liar" and screamed at her.

Ms. Dahl also alleges that Mr. Smith harassed her by calling her "tubby" and "pork chop." Ms. Dahl believes that Mr. Smith referred to her as "pork chop" because of her weight. Mr. Smith did not mention Ms. Dahl's gender when he called her "pork chop."

After being informed of her termination, Ms. Dahl told Mr. Smith that he was harassing her "just like [he] did Brenda [Garza]" and "Holly Dugger," other female employees of the Racine IHOP. Ms. Dahl claims that Mr. Smith sexually harassed Brenda Garza and Holly Dugger by calling them in the middle of the night. Yet, Ms. Dahl never obtained a written statement from Holly Dugger about these allegations. Ms. Dahl claims that she previously reported Holly Dugger's accusations to Flipmeastack. Following Ms. Dahl's complaint to Flipmeastack, she is unaware of any further complaints from Ms. Dugger about Mr. Smith. Ms. Dahl also claimed that Brenda Garza complained to her about Mr. Smith sexually harassing her. Ms. Dahl never obtained a written statement from Ms. Garza. Ms. Dahl did not recall if Ms. Garza had any further complaints about Mr. Smith.

In response to Ms. Dahl's allegations of harassment on May 25, 2005, Mr. Smith stepped away from Ms. Dahl, made a phone call to Mr. Kuenstler, and informed Mr. Kuenstler that Ms. Dahl was accusing him of harassment. Mr. Smith handed Ms. Dahl his telephone and Mr. Kuenstler asked Ms. Dahl what was happening at the restaurant. Ms. Dahl explained to Kuenstler that "I don't know why he [Mr. Smith] is harassing me, but he is." Mr. Smith then took his cell phone back and walked into the dining room. He then came

back into the office, asked Ms. Dahl to calm down and walked back out of the office. Mr. Smith returned to the office and handed his cell phone to Ms. Dahl. Mr. Kuenstler was on the telephone and he explained to Ms. Dahl that her termination stood. Kuenstler told Dahl, "You never were good; you never will be; get out."

On May 29, 2005, Mr. Smith completed his investigation into the allegations of sexual harassment and obtained written statements from the servers that he had interviewed. The written statements by the servers stated that they had been sexually harassed by Mr. Gutierrez, that they had complained to Ms. Dahl, but that nothing was done. Ms. Dahl claims that the witness statements obtained by Mr. Smith were coerced.

Ms. Dahl also alleges that she suffered gender discrimination because Mr. Smith "treated [her] rudely, intimidated [her], called [her] names, and rubbed the cleavage of [her] daughter's picture on [her] office wall."

Ms. Dahl further alleges that she was discriminated against based upon her sex because she was denied a District Manager position. According to Dahl, Mr. Smith told her that she would not be given the opportunity to advance to a District Manager position with MHR. However, Ms. Dahl never applied for a District Manager position. She concedes that a District Manager position was not even open and available at the time she was allegedly denied a position. Also, another female employee was next in line for a District Manager position because the other female employee worked there longer.

-9-

Case 2:07-cv-00280-RTR    Filed 12/05/08    Page 9 of 15    Document 39

Ms. Dahl also alleges that after her termination, Mr. Smith continued to harass her by making numerous phone calls to her cell phone and home phone. Ms. Dahl conceded that Mr. Smith called her and told her, "I'm trying to give you a job . . . I got a job for you."

**ANALYSIS**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**I.  Disparate Treatment**

In response to MHR's motion for summary judgment, Dahl offers no direct or circumstantial evidence that she was terminated because of her gender. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 n.3 (7th Cir. 2005) (party can proceed under the direct method using direct or circumstantial evidence). Nor does she attempt to proceed under the indirect, burden-shifting framework. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). The Court will not conduct the analysis for Dahl, as it appears that she abandoned this aspect of her case entirely. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996).

**II.    Harassment**

There are four general elements for a harassment (or hostile work environment) claim: (1) the plaintiff must be the object of unwelcome harassment; (2) the harassment must be based on race, gender, or any other protected characteristic; (3) it must be sufficiently severe or pervasive so as to alter the conditions of employment; and (4) there must be a basis for employer liability. *See Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008). As an initial matter, there is very little evidence in the record to suggest that any of the harassment directed towards Dahl was based on her gender. The more glaring issue is that the alleged harassing conduct, even taken in the light most favorable to Dahl, simply does not rise to an actionable level.

To determine whether harassment is "severe or pervasive," courts consider a variety of factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). The "line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other" is thin. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV*

*Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Dahl worked at the Racine IHOP under Smith's direction for approximately only two months. In that time, Dahl alleges that Smith referred to her by derogatory nicknames ("tubby," "pork chop") and rubbed a picture of Dahl's daughter's cleavage. At best, this conduct qualifies as "occasional vulgar banter," not actionable harassment. *See, e.g., Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaints of eight gender-related comments during course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment).

Smith also yelled at Dahl and called her a "f-ing compulsive liar" on the day she was terminated. Even if this comment was made with gender-based animus (which it was not, *see, e.g., Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002)), isolated incidents of yelling or screaming are not enough to establish severe or pervasive harassment. *See McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004); *George v. Leavitt*, 407 F.3d 405, 416-17 (D.C. Cir. 2005) (telling a plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved, were isolated incidents that did not rise to the level of severity necessary to find a hostile work environment).

Finally, Dahl attempts to establish a sexually hostile work environment by virtue of Smith's harassment of other female employees at the Racine IHOP. "Second-hand"

-12-

harassment is generally insufficient to establish a hostile work environment. *See Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 758 (7th Cir. 1998).

**III. Retaliation**

Instead of pursuing a claim for gender discrimination, Dahl attempts to defeat summary judgment by arguing that she was terminated in retaliation for complaining about discrimination. Title VII prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII. *See* 42 U.S.C. § 2000e-3(a). The direct method of proving a retaliation claim requires the plaintiff to show (1) statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

Dahl claims retaliation for her complaint to Mr. Kuentsler that Mr. Smith was "harassing her" on the day she was fired. Dahl also alleges that she previously lodged numerous discrimination complaints, on her own behalf and on behalf of other employees, going back to the beginning of 2005 during her time at the Kenosha IHOP. MHR argues that Dahl is lying about the previous complaints, and that Dahl did not complain about harassment at all until *after* she was fired. Even accepting Dahl's allegations as true, she offers no evidence, direct or circumstantial, establishing a causal connection between her termination and any of her alleged complaints. Dahl argues that there is a genuine issue of material fact as to whether Mr. Smith knew about her protected activities, but "mere

-13-

knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive." *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999).

The alternative indirect method requires the plaintiff to show the following: (1) she engaged in statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903-04 (7th Cir. 2005). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to present evidence of a non-discriminatory reason for its employment action. *Id.* If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. *Id.*

After essentially conceding that she has no direct evidence of retaliation, Dahl jumps into a discussion of pretext, yet she does not attempt to establish all of the elements of her *prima facie* case. It appears that Dahl was not meeting MHR's legitimate expectations because she failed to report allegations of sexual harassment. Dahl also fails to identify any similarly situated employees who were treated more favorably and who did not engage in protected activity.

Even considering Dahl's pretext argument, it mainly consists of Dahl pointing out various inconsistencies in Mr. Smith's testimony. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). Arguing that credibility is central to the pretext issue is not enough to raise a

-14-

triable issue of fact. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (a party cannot meet its burden of proof by relying on the hope that the jury will not trust the credibility of the witnesses); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) (upholding grant of summary judgment where plaintiff merely questioned the employer's credibility without showing any evidence of pretext). The evidence in the record establishes that Dahl was terminated based upon Smith's determination that Dahl failed to report harassment complaints. Aside from speculation, Dahl offers no competent evidence that MHR did not in fact believe this to be the case or that this scenario was altogether unbelievable. *See Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. MHR's motion for summary judgment [D. 20] is **GRANTED**; and

2. This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 5th day of December, 2008.

                                                  **SO ORDERED,**

                                                  *s/ Rudolph T. Randa*
                                                  **HON. RUDOLPH T. RANDA**
                                                  **Chief Judge**